EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| THE FIREMEN'S CHARITABLE & BENEVOLENT ASSOCIATION OF NEW ORLEANS | CIVIL ACTION |
| VERSUS | NO: 04-0017 |
| ORKIN, INC. F/N/A ORKIN EXTERMINATING COMPANY, INC. D/B/A/ ORKIN PEST CONTROL | SECTION: "S" (5) |

**ORDER AND REASONS**

**IT IS HEREBY ORDERED** that "Defendant's Motion for Partial Summary Judgment" on The Fireman's Charitable & Benevolent Association of New Orleans' claims in tort and for punitive damages is **GRANTED**.  (Document #130.)

**IT IS FURTHER ORDERED** that Orkin, Inc.'s "Motion *in Limine* to Exclude Evidence of Defendant's Wealth and Alternative Motion to Bifurcate Trial Pursuant to Federal Rules of Civil Procedure 42(b)" is **DENIED AS MOOT**.  (Document #129.)

**I. BACKGROUND**

From 1953 until December 31, 1997, Orkin Exterminating Company, Inc. (Orkin) conducted a pest control business at 102 and 102b City Park Avenue, pursuant to a lease with

The Firemen's Charitable & Benevolent Association of New Orleans (Firemen's), the owner of the property.  Orkin stored or disposed of various toxic pesticides in its operations:  chlordane, heptachlor, heptachlor epoxide, DDE, DDT, and dieldrin.

A written lease was signed in 1962.  A new lease to cover the term of January 1, 1988 to December 31, 1997, included an amendment that obligated Orkin to remove "all contamination resulting from the use of the premises," and not to use the property for any purpose that "tends to injure or depreciate the property."[1]

Prior to the expiration of the lease, Orkin retained Malcolm Pirnie, Inc. (Malcolm Pirnie), an environmental consulting firm, to conduct an evaluation of the site in order to determine if any clean-up efforts would be necessary before Orkin ceased operations on the property.  See Defendant's exh. E.  Malcolm Pirnie found some positive levels of pesticides at various locations on the property.  By September 1997, Malcolm Pirnie provided the Louisiana Department of Agriculture and Forestry (LDAF) with a draft "Soil Characterization Report," indicating the precise locations and levels of pesticides that were in excess of current regulatory screening standards.  Id. at 334.  In October 1997, Malcolm Pirnie prepared a "Remedial Action Plan."[2]

---

[1] Paragraph (7) of the lease provides:
   Lessee is obligated not to use the premises for any purpose that is unlawful or that tends to injure or depreciate the property.  Lessee warrants and agrees that it will use the property in accordance with the environmental laws of the City of New Orleans, State of Louisiana, and the United States of America, will store no combustible, explosive, or hazardous materials, and that all contamination resulting from the use of the premises will be removed under applicable laws of the City of New Orleans, State of Louisiana, and the United States of America.

[2] The "Remedial Action Plan" includes an overlay of the areas for excavation, arrows indicating the direction of surface runoff, a discussion of post-excavation, confirmatory

Orkin presented a copy of the plan to Firemen's on March 20, 1998.

When Orkin ceased activities on the leased property on December 31, 1997, it began remediation and cleanup of chemicals as required under the terms of the lease. In October 1998, Malcolm Pirnie provided the LDAF with analytical data for the confirmation samples in the portion of the property that had been excavated and backfilled under procedures approved by LDAF. Defendant's exh. F. at 2656. Excavation continued to take place in the area that was to be excavated to a depth of five feet. Id. Malcolm Pirnie advised that a final confirmation sample would be taken before backfilling the excavation with clean, off-site granular fill in accordance with the "Remedial Action Plan." Id. at 2657. In January 1999, Orkin completed the remediation and cleanup under the supervision of the LDAF.

In May 2002, James McKay, III, Firemen's president, entered a lease agreement for the property with the Orleans Parish Communication District (OPCD). Defendant's exh. H. Pursuant to a term of the lease agreement that provided for a 90-day diligence period, the OPCD entered a contract with Materials Management Group, Inc. (MMG) to perform Phase I and Phase II Environmental Surveys of the property. Defendant's exh. I. The Phase I survey in July 2002 revealed potential contamination and indicated additional action that would be required. MMG's Phase II survey in October 2002 "determined that soils at this site have been impacted by pesticide contamination." Id. at 377. Contaminant levels in three of five borings were above the current most stringent applicable levels. Id.

---

sampling, a table which lists the detection limits for post-excavation and performance verification soil samples. Defendant's exh. G at 1657.

At a monthly meeting of the Firemen's subcommittee on cemeteries on July 10, 2002, Chairman McKay informed the committee that problems were found at the Orkin site and that the time for OPCD to conduct due diligence may need to be extended.  Defendant's exh. K.  On August 9, 2002, Jim Blazek, MMG's senior project manager, met with OPCD to discuss MMG's findings concerning the pesticide cleanup performed by Orkin.  Defendant's exh. L.  Firemen's and OPCD asked Blazek to meet with the LDAF.  Id.  In a letter to OPCD on October 28, 2002, Blazek stated that he informed Larry LeJeune of LDAF "that some pesticides were found above the RECAP levels near the old green house area on the Old Orkin site."  Defendant's exh. N.  LeJeune suggested that MMG run a "SPLP" sample analysis on the samples that had already been collected.  Id.  If the results came back below a certain level, a "No Further Action" letter could be issued without additional sampling.  Id.

On October 28, 2002, Firemen's hired McCune Consultants, Inc. (McCune) as its own expert to conduct a soil investigation, to determine whether any contamination existed on the property, and to evaluate the distribution of indicator constituents in shallow soils.  On November 13, 2002, McCune notified LDAF that he represented Firemen's.  In March 2003, McCune provided Firemen's with laboratory results showing that Orkin had contaminated and failed to clean up the leased property, and that chemicals remained in quantities above Louisiana regulatory standards.  For example, soil samples collected from boring SB-1 and boring SB-5 showed the presence of Chlordane, a banned pesticide.

On January 5, 2004, Firemen's filed a complaint against Orkin, asserting claims of negligence; strict liability; a continuing, ongoing, and damaging nuisance and trespass to

Firemen's property interest; loss of use and enjoyment of the property, including lower property values, quiet use and enjoyment, and potential liability to state, federal, and municipal environmental agencies, landowners, and injured third parties; contractual liability to restore the leased property to its original condition under La. Civ. Code articles 2719 and 2720; unjust enrichment; and exemplary damages, pursuant to La. Civ. Code art. 2315.3.[3] Firemen's alleged that it suffered damage because Orkin engaged in dangerous land spillage, disposal, and storage practices and failed to act responsibly or reasonably to the danger. Firemen's alleged that, rather than remove the toxins that contaminated the ground, surface waters, and ground waters, Orkin abandoned the contamination as a routine practice, allowing the spread and migration of the toxic pollution. Further, Orkin failed to warn the public and Firemen's that the sites were contaminated or that there was a hazard to persons and property. Orkin also sought injunctive relief mandating Orkin to restore the property and prohibiting Orkin from engaging in conduct which contributes to the migration of the toxic pollution, and a declaratory judgment that Orkin has breached its contractual obligations.

Orkin filed a motion for partial summary judgment seeking to dismiss Firemen's tort claims and punitive damages claims as prescribed, leaving only the contractual claims that arise from the lease agreement between Orkin and Firemen's.

## II. DISCUSSION

---

[3] Prior to its repeal in 1996, article 2315.3 provided in pertinent part:
In addition to general and special damages, exemplary damages may be awarded, if it is proved that Plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances.

### A. Summary judgment standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); Fed. R. Civ. P. 56(c). If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).

### B. Tort claims

Orkin contends that Firemen's tort claims have prescribed because Firemen's failed to file the complaint within one year of the alleged wrongful conduct. Orkin argues that Firemen's knew that chemicals were found in the soil in March 1998 when it received a copy of the summary of the results of the soil sampling and the proposed remediation plan. In addition, Orkin contends that Firemen's had further knowledge of the extent of the contamination when it received the results of OPCD's survey prepared by MMG on October 25, 2002 and hired McCune as its own expert.

Orkin contends that the doctrine of *contra non valentem* does not apply because Firemen's knew of the contamination more than one year before filing suit. Orkin argues that by Firemen's taking action on October 28, 2002 of hiring McCune and giving OPCD a six-month extension to complete due diligence on the lease, it manifested its knowledge of the contamination.

Further, Orkin contends that the continuing tort doctrine does not toll prescription in cases involving land contamination where there is no continuing conduct that is resulting in damage. Orkin argues that whatever actions or inactions may have caused contamination of the site ended in 1999, when Orkin's involvement with the property ceased. Therefore, Orkin argues, there is no continuing wrongful conduct to make the continuing tort doctrine applicable.

**1.** *Contra non valentem*

Under Louisiana Civil Code article 3492, "[d]elictual actions are subject to a liberative prescription of one year." In Corsey v. State of Louisiana, Dep't of Corrections, 375 So.2d 1319, 1322 (La. 1979), the Supreme Court of Louisiana recognized the doctrine of *contra non valentem* as applicable to preventing the commencement of prescription in four categories of situations when "the cause of action has accrued but nevertheless the plaintiff was prevented from enforcing it for some reason external to his own will." The fourth category, applicable "where the cause of action is not known or reasonably knowable by the plaintiff even though his ignorance was not induced by the defendant," was apparently codified in 1983 with the adoption of La. C.C. art. 3493 to apply in cases of damage to immovable property. "When damage is caused to immovable property, the one year prescription commences to run from the day the owner of the immovable property acquired, or should have acquired, knowledge of the damage."

The critical issue in most Category Four *contra non valentem* cases is not whether prescription was suspended by the plaintiff's lack of knowledge, but when prescription began to run upon discovery. The "sufficient to excite inquiry" test relied upon by Firemen's was used in Cartwright v. Chrysler Corp., 232 So.2d 285, 287 (La. 1970), but Cartwright has been overruled

7

on this point. In Jordan v. Employee Transfer Corp., 509 So2d 420, 423 (La. 1987), the Supreme Court criticized the Cartwright test as "incomplete" and mandated a "reasonableness of action or inaction" test. The Court, observing that the mere apprehension that something is wrong is not sufficient to commence the running of prescription, held that the determination of the date of the commencement of prescription depends upon the reasonableness of the plaintiff's action or inaction between the event causing the damage that eventually became manifest and the filing of suit.

The undisputed facts in this case establish that Firemen's had extensive knowledge of the conduct that caused the contamination more than one year prior to filing the complaint. On May 28, 1998, Firemen's attorney wrote to Orkin advising that legal steps would be taken unless the property was cleared of chemicals within 45 days. Defendant's exh. F at 642. On July 23, 1998, counsel again suggested to Orkin "that there should be no confusion about the obligation of Orkin to remove all contamination resulting from its use of the premises." Id. at 643. On July 10, 2002, McKay informed other committee members that there were problems at the Orkin site. Further, MMG's Phase II analysis was completed on October 24, 2002, and Firemen's received a copy of the report on October 25, 2002. The report showed that, despite Orkin's attempt at remediation, chemicals were found in the soil in excess of the State screening standards. Firemen's tort suit filed on January 5, 2004, was more than one year after the damage was known or should have been known to Firemen's.

In light of this knowledge, Firemen's inaction was unreasonable, and the doctrine of *contra non valentem* does not apply.

### 2. Continuing tort

In <u>Crump v. Sabine River Authority</u>, 737 So.2d 720 (La. 1999), the Supreme Court of Louisiana clarified the continuing tort doctrine in a property law case. In 1965, Crump sold 18 of her 60 acres of property to the Sabine River Authority for constructing the Toledo Bend Reservoir. The land purchased by the Sabine River Authority was located south of McDonald Bayou, which flowed through the southern portion of the plaintiff's property. After the sale, the Sabine River Authority leased back a portion of the purchased property to permit Crump to have access to the Toledo Bend Lake, and the north bank of McDonald Bayou became the south border of the lease back area. In 1968, the construction of the reservoir was completed, and water filled the reservoir, thus allowing Crump access from her property to the reservoir or the Sabine River by way of McDonald Bayou.

On June 3, 1969, Crump advised the Sabine River Authority that one of her neighbors intended to apply for permission to dredge out the creek or bayou which passes through the property that was leased to her. She opposed any such use of the bayou because it would interfere with her use of the property that was leased to her, and requested notice of any application by her neighbors. On June 4, 1969, the Sabine River Authority responded that there was no record of an application to dig a channel.

In 1971, Crump saw her neighbor digging a canal on property owned by the Sabine River Authority. The canal had the effect of altering the flow of water in McDonald Bayou, drying up a portion of the bayou, and depriving Crump of access to the Toledo Bend Lake from her property.

In 1989, approximately 18 years after the digging of the canal, the Sabine River Authority dug out one end of the canal in order to restore the normal flow of water to McDonald Bayou.  This method proved to be unsuccessful, and in 1991, the Sabine River Authority suggested a new cutoff canal and dam.  Crump hired and paid for a contractor to do the work, but the problem was not cured.

In 1992, Crump once again contacted the Sabine River Authority.  The Board of Commissioners determined that the Sabine River Authority should not interject itself into individual disputes along the shoreline and that it should take no action.  On December 21, 1992, Crump filed a negligence action against the Sabine River Authority seeking damages and a mandatory injunction.

The Supreme Court held that the negligence action had prescribed.  The Court held that "the operating cause of the injury in this case was the digging of the canal on the defendant's property and that the plaintiff has failed to establish continuous tortious conduct on the part of the defendant in connection with that activity."  The Court examined the theory of continuing tort as follows:

> [T]he theory of continuing tort has its roots in property damage cases and requires that the operating cause of the injury be a continuous one which results in continuous damages.  *Bustamento v. Tucker*, 607 So.2d 532, 543 n.8 (La. 1992); South Central Bell Telephone Co. v. Texaco, Inc., 418 So.2d 531, 533 (La. 1982). Professor Yiannopoulos, in his treatise on Louisiana predial servitudes clarified this requirement as it relates to prescription as follows:
> "[A] distinction is made between continuous and discontinuous causes of injury and resulting damage.  When the *operating cause of the injury* is 'not a continuous one of daily occurrence,' there is a multiplicity of causes of action and of corresponding prescriptive periods.  Prescription is completed as to each injury, and the action is barred upon the lapse of one year from the date in which

> the plaintiff acquired, or should have acquired, knowledge of the damage . . . . [This is to be distinguished from the situation where] the *operating cause of the injury* is a continuous one, giving rise to successive damages from day to day . . . ." A. N. Yiannopoulous, *Predial Servitudes*, § 63 (1983).

Id. at 726. "A continuing tort is occasioned by unlawful acts, not the continuation of the ill effects of an original, wrongful act." Id. at 728. "The continuous conduct contemplated in a continuing tort must be tortious and must be the operating cause of the injury." Id. at 729 n.7. In cases where the operating cause of the injury is a continuous one and gives rise to successive damages, "prescription dates from the cessation of the wrongful conduct causing the damage. Crump, 737 So.2d at 726.

In this case, there is no basis to apply the doctrine of continuing tort because there have been no continuing acts or conduct by Orkin since 1999. Although the allegations are that the contamination was continuing, there is no allegation of a continuing act causing contamination. The operating cause of Firemen's injury was Orkin's contamination of the property and failure to perform adequate remediation. The conduct abated when Orkin ceased operations in 1997 and when Orkin's remediation effort was completed in 1999. As in Crump, the operating cause of the injury had terminated and the continued existence of the damage brought about by the pre-1999 conduct is insufficient to support the application of the continuing tort doctrine.

**C.  Punitive damages**

Orkin contends that Firemen's is unable to recover punitive damages under former article 2315.3 because the tort damages are prescribed. "Damages under La. C.C. art. 2315.3 are

recoverable on a derivative basis where a plaintiff is entitled to recover tort damages." <u>Corbello v. Iowa Production</u>, 850 So.2d 687 (La. 2003).  Because Firemen's tort claims for compensatory damages are prescribed, it is not entitled to punitive damages, and the claim is dismissed.

### III. CONCLUSION

Accordingly, there are no genuine issues as to any material fact, and Orkin is entitled to judgment as a matter of law, dismissing the claims in tort and for punitive damages as prescribed.

Further, because the punitive damages claim is dismissed, Orkin's "Motion *in Limine* to Exclude Evidence of Defendant's Wealth and Alternative Motion to Bifurcate Trial Pursuant to Federal Rule of Civil Procedure 42(b)" must be denied as moot.

New Orleans, Louisiana, this   16th   day of March, 2006.

_____
**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**